UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS D. LITTLE,

    Plaintiff,

v.                                        Case No. 12-13834

UNITED OF OMAHA LIFE INSURANCE
COMPANY,

    Defendant.
                                                /

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT
AND GRANTING DEFENDANT'S MOTION FOR JUDGMENT**

Plaintiff Douglas Little sues Defendant United of Omaha Life Insurance Company to recover benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Both parties move for judgment on the administrative record. The motions have been fully briefed, and no hearing is needed. *See* E.D. Mich. LR7.1(f)(2). Defendant's motion will be granted and Plaintiff's motion will be denied.

**I. BACKGROUND**

Plaintiff, a 51-year-old veteran, began working for Detroit Renewable Energy ("DRE") on September 17, 2001, as a vacuum truck operator. (AR at 232.) Defendant issued Group Policy No. GUC-AJY7 ("Policy") to DRE, effective October 1, 2011, to provide short-term disability ("STD") benefits to union employees. (Answer at ¶ 2.) Plaintiff seeks both short and long term disability ("LTD") benefits, as well as life insurance coverage under the Policy. (Compl. at ¶ 9.)

### A. Plaintiff's Claim for STD Benefits

Plaintiff stopped working on January 31, 2012, and on February 2, 2012, submitted an STD claim alleging left knee pain. (AR 229.) Under "estimated return to work date," Plaintiff entered "ORTHO CONSULT - 3-20-12." (*Id.*) An attending physician's statement (APS), completed and signed by Dr. Gary Weekes, accompanied Plaintiff's STD claim. (*Id.* at 233-234.) Dr. Weekes entered the diagnosis as "CHRONIC KNEE PAIN," the symptoms as "L KNEE PAIN," the initial and last date of treatment as February 1, 2012, and the next date of treatment as "3-20-12 - ORTHO." (*Id.* at 233.) DRE completed the employer's statement section, noting that, Plaintiff's job as a vacuum truck operator is considered "Heavy," meaning "100 lbs. Maximum lifting with frequent lift/carry up to 50 lbs." (*Id.* at 232.)

After receiving the STD claim, Defendant told Plaintiff that, to resolve the claim, it needed medical records from Dr. Weekes. (*Id.* at 218.) Nonetheless, on March 16, 2012, Defendant informed Plaintiff that, while Defendant reviewed the requested medical information, he would receive STD benefits from February 8, 2012, through March 20, 2012, when Plaintiff was to consult an orthopedist. (*Id.*)

Plaintiff suffers from degenerative arthritis. (AR at 144.) As the most common form of arthritis, "[i]t is estimated that 26.9 million Americans 25 years old or older have clinical degenerative arthritis of some joints, with a higher percentage of affliction in the older population." *Autologous Adipose Tissue Derived Mesenchymal Stem Cells Transplantation in Patient With Degenerative Arthritis*, ClinicalTrials.gov, http:// clinicaltrials.gov /ct2/ show/ NCT01300598 (last visited August 21, 2013) (the rendering

of this URL and subsequent URLs contains spaces). "[C]linical manifestations [of degenerative arthritis] include joint pain and impairment to movement, and surrounding tissues are often affected with local inflammation." *Id.* Specifically, individuals that suffer from degenerative arthritis of the knee "complain of pain with activity, relieved by rest." Preparing Orthopedic Disability Cases, *Common Lower Extremity Problems* § 5.02 (2006). In addition, "some patients have chronic swelling (effusion) or grinding noises (crepitus) with movement." *Id.*

X-rays of Plaintiff's knee taken during his initial visit with Dr. Weekes, had shown "minimal degenerative changes involving all the 3 compartments [of the knee]." (*Id.* at 140.) The x-ray report further stated, "No signs of joint effusion." (*Id.*) Medical records from another doctor seen shortly after, Dr. Treece, state that Plaintiff suffers from "generalized osteoarthritis." (*Id.* at 83.) Osteoarthritis, interchangeable with degenerative joint disease, occurs mainly "due to aging and wear and tear on a joint." *Osteoarthritis*, MedlinePlus, http:// www.nlm.nih.gov/ medlineplus/ ency/ article/ 000423.htm (last visited August 19, 2013). Under "musculoskeletal," Dr. Trece wrote, "Normal range of motion, Normal strength, No deformity, Normal gait." (*Id.*)

Records from the March 20, 2012 orthopedics consultation with nurse practitioner Alan Kowalski stated that Plaintiff had been experiencing left knee pain for five years, that he denied any recent trauma, and that he had had cortisone injections in the past with noted relief. (*Id.* at 153, 155.) Dr. Kowalski noted that there was joint line tenderness and effusion, but that there was no crepitus (grinding noises) and no pain with internal and external rotation. (*Id.*) Plaintiff received a cortisone injection and a prescription for etodolac, and Dr. Kowalski directed him to return in three months. (*Id.*

3

at 188-191.) Etodolac is used to "relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis." *Etodolac*, MedlinePlus, http:// www.nlm.nih.gov/ medlineplus/ druginfo/ meds/ a692015.html (last visited August 19, 2013).

Notes from a subsequent visit with Dr. Weekes state that Plaintiff wears a knee brace and that he uses a cane to assist with ambulation, that Plaintiff's knee "swelling gets worse progressively during the day," and that Plaintiff "takes vicodin for relief." (*Id.* at 120.) Dr. Weekes also noted, "mild edema left extremity, limited range of motion left knee gait . . . ." (*Ia.*) Edema is "swelling caused by fluid in [the] body's tissues." *Edema*, MedlinePlus, http:// www.nlm.nih.gov/ medlineplus/ edema.html (last visited August 19, 2013). Dr. Weekes instructed Plaintiff to consult the orthopedist again in three months, attend physical therapy, and continue taking vicodin. After that April 11, 2012 visit, Dr. Weekes wrote a letter addressed to whom it may concern stating, "At this time the patient is having problems standing for long periods or walking long distances. Therefore, the patient needs to be off work indefinitely to allow further time for evaluation and treatment of his medical condition." (*Id.* at 123.) A subsequent April 27, 2011 APS, completed by physical therapist Martha Hauser, documents specific restrictions: Plaintiff can sit, stand, or walk for four hours at a time within a twelve hour period and Plaintiff should refrain from using his right arm to lift anything over 50 pounds. (*Id.* at 192-3).

In addition to medical information about Plaintiff's knee, Defendant received documentation regarding Plaintiff's other ailments.[1] The Department of Veteran Affairs

---

[1] Plaintiff suffers from a history of other ailments including hyperlipidemia, obesity, lymphedema, acid reflux, and sleep apnea. (AR at 146, 120, 92).

4

("VA") determined that as of February 3, 2011, Mr. Little has a service-connected disability rated at 100 percent.  (*Id.* at 188.)  Plaintiff's evaluation description was amended from "hypertensive heart disease with left ventricular hypertrophy evaluated as 30 percent disabling" to "hypertensive heart disease with chronic congestive heart failure . . . increased to 100 percent disabling."  (*Id.*)  Also on February 3, 2011, the VA determined that Mr. Little's hypertension (high blood pressure) with a 20 percent disability rating would be maintained.  (*Id.* at 188-91.)  The VA has also rated Plaintiff's degenerative arthritis 20 percent disabling, but never specifically refers to Plaintiff's left knee.  (AR at 205.)

After reviewing all of Plaintiff's medical records—about his left knee as well as his other ailments–-on May 9, 2012, Defendant informed Plaintiff that it was denying his requests for STD benefits after March 20, 2012.  (*Id.* at 58-62.)  Plaintiff appealed this denial, but his appeal provided no new information.  (*Id.* at 63.)  Two weeks later, Defendant informed Plaintiff that it was denying his appeal for STD benefits, that he had exhausted his administrative remedies, and that he had the right to bring a civil action under ERISA.  (*Id.* at 54-7.)  Plaintiff sued Defendant seeking STD benefits.

### B.  Plaintiff's Claim for LTD Benefits

In addition to Plaintiff's claim for STD benefits, Plaintiff seeks LTD benefits.  Although Plaintiff never applied for LTD benefits, he contends that, "based on United's rationale for denying his short-term disability claim, it would be futile to submit an application for long-term disability benefits . . . ."  (Compl. at ¶ 3.)  The administrative record contains the STD policy only; it does not contain the LTD policy.

5

### C. Plaintiff's Claim for Ongoing Life Insurance Coverage

In addition to Plaintiff's requests for STD and LTD benefits, Plaintiff seeks "ongoing life insurance coverage pursuant to a waiver of premium due to total disability . . . ." (Compl. at ¶ 6.) There is no information in the administrative record relating to life insurance coverage pursuant to a waiver of premium.

### II. STANDARD

Generally, the district court reviews a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "If a plan affords such discretion to an administrator or fiduciary, we review the denial of benefits only to determine if it was 'arbitrary and capricious.'" *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 456 (2003) (citing *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991)). However, in Michigan, *all* ERISA plans issued or amended subsequent to July 1, 2007, require *de novo* review of denials of ERISA benefits. *Gray v. Mut. of Omaha Life Ins. Co.,* 11-15016, 2012 WL 2995469, at *3 (E.D. Mich. July 23, 2012); *see also Smiertka v. Guardian Life Ins. Co. of Am.*, 1:12-CV-99, 2013 WL 1304498, at *5 (W.D. Mich. Mar. 28, 2013) ("In effect, Rule 500.2202 voids discretionary clauses in insurance policies issued after July 1, 2007, thus requiring a reviewing court to apply a *de novo* standard of review.").

As of July 1, 2007, the Michigan Office of Financial and Insurance Services (OFIS) prohibits policies authorizing discretionary authority provisions that would implicate an arbitrary and capricious standard of review. Mich. Admin. Code r.

500.2201-02. According to the code, after July 1, 2007, "an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause." *Id.* The code further states, "a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect." *Id.* Preemption does not impact this analysis. Addressing the interplay between ERISA and the Michigan code, the Sixth Circuit definitively stated, "Michigan rules fall within the ambit of ERISA's savings clause and are not preempted by that statute." *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 602 (6th Cir. 2009).

Here, the Policy was "issued in and subject to Michigan law" and became effective October 1, 2011, well after the effective date of the Michigan rules prohibiting discretionary clauses. (AR at 1.) Thus, this court will review the denial of Plaintiff's disability claim, *de novo*, which means "without deference to the decision or any presumption of correctness, based on the record before the administrator." *Perry v. Simplicity Eng'g, a Div. of Lukens General Ind., Inc.,* 900 F.2d 963, 966 (6th Cir. 1990). The court must determine "whether or not it agrees with the decision under review." *Id.* In performing this review, the court is limited to the administrative record. *Id.*; *see also Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616-8 (6th Cir. 1998) ("When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator."). Thus, the court "is obligated to determine whether the administrator properly interpreted the plan and if the insured was entitled to benefits

7

under the plan." *Kaye v. Unum Grp./Provident Life and Accident,* No. 09–14873, 2012 WL 124845, at * 5 (E.D. Mich. Jan.17, 2012) (citing *Perry,* 900 F.2d at 967).

### III. DISCUSSION

Applying a *de novo* standard of review to the facts contained in the administrative record, it is clear that Defendant's decision to deny Plaintiff's disability benefits was correct. Plaintiff is not entitled to STD or LTD benefits. Plaintiff is also not entitled to life insurance coverage. Each claim will be addressed in turn.

### A. Plaintiff's Claim for STD Benefits

As of February 3, 2012, Plaintiff is 100 percent disabled due to his hypertensive heart disease. (AR at 188.) Yet in Plaintiff's STD claim form, Plaintiff as well as Dr. Weekes, alleged his sole medical problem as left knee pain.[2] (Def.'s Mot. For J. ¶ 2.) Dr. Weekes most recent note from April 11, 2012 also fails to mention Plaintiff's hypertension and instead focuses on Plaintiff's "problems standing for long periods or walking long distances." (AR at 123.) Thus, Defendant is correct: "[d]uring the administrative review of his claim for STD benefits, neither plaintiff nor his attending physician referred to any basis for alleged disability except left knee pain." (Def.'s Mot. For J. ¶ 2.) In response, Plaintiff contends that Defendant's "form over substance argument lacks merit." (Pl's Resp. To Def.'s Mot. For J. at Pg 2.) Neither Plaintiff nor

---

[2] As Defendant points out, throughout this litigation, "Plaintiff repeatedly attempts to rewrite and expand his claim of short term disability by adding to left knee pain other conditions not mentioned by him or his attending physician in their STD Claim Form Statements." (Def.'s Mot. For J. at Pg 5.)

8

Defendant cite any legal authority or Policy provision suggesting that a claimant is (or is not) limited to establishing disability on the exclusive basis alleged in his claim form.

Under ERISA, a participant may bring a civil action (1) "to recover benefits due to him *under the terms of his plan*," (2) "to enforce his rights *under the terms of the plan*," or (3) "to clarify his rights to future benefits *under the terms of the plan*." 29 U.S.C. § 1132(a)(1)(B) (emphases added). Thus, in order to be eligible for benefits, Plaintiff must show he was "disabled" under the terms of the plan. *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734, 744 (6th Cir. 2005). The Policy's Certificate of Insurance also states, "The benefits described in this Certificate are subject to the terms and conditions of the policy. Benefits are effective only if you are eligible for the insurance, become insured and remain insured as described in this Certificate." (AR at 17.)

Federal courts apply general rules of contract law, incorporated as part of the federal common law, when interpreting ERISA plans. *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002) (internal quotation marks omitted). As such, courts interpret ERISA plans "according to their plain meaning, in an ordinary and popular sense." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 712 (6th Cir. 2000). Under the plain meaning approach, a court is required to "give effect to the unambiguous terms of an ERISA plan." (*Id.*)

### 1. "Disability" Under The Policy

In ERISA cases, "'disability' is not a term of art but one that varies from plan to plan. *Hansen v. Metro. Life Ins. Co.*, 192 F. App'x 319, 323 (6th Cir. 2006). According to the Policy:

> **Disability and Disabled** means that because of an Injury or *Sickness*, a *significant change* in Your mental or physical functional capacity has occurred in which:
>
> (a) during the Elimination Period, You are prevented from performing the Material Duties of Your Regular Job (on a part-time or full-time basis) or are unable to work Full-Time; and
>
> (b) after the Elimination Period, You are:
>
> (1) prevented from performing the Material Duties of Your Regular Job (on a part-time or full-time basis) or are unable to work Full-Time; and
>
> (2) unable to generate Current Earnings which exceed 99% of Your Weekly Earnings due to that same Injury or Sickness.
>
> Disability is determined relative to your ability or inability to work. It is not determined by the availability of a suitable position with your employer.

(AR at 40 (emphases added).)

Because an injury—"an accidental bodily injury which is the direct result of a sudden, unexpected and unintended external force or element"—was clearly not the impetus for his filing a disability claim, to qualify, Plaintiff must be disabled because of a sickness. (*Id.* at 41.) A "sickness" is "a disease, disorder or condition . . . for which you are under the care of a Physician. . . . [D]isability *must begin* while you are insured under the Policy." (*Id.* (emphasis added).) "Material Duties" are defined as "the

10

essential tasks, functions, and operations relating to Your Regular Job that cannot be reasonably omitted or modified." (*Id.* at 41.) Finally, "Regular Job" means "the occupation You are routinely performing when Your disability begins." (*Id.* at 42.)

Apparently, no formal job description of a vacuum truck operator exists. After speaking with a representative at DRE, Defendant's employee noted, "He [the representative at DRE] states they have no formal job description. Insured is required to walk and stand throughout the day, He lifts hoses on truck. He would be required to lift between 10-60 pounds." (AR at 45.) This description is consistent with the employer's statement section of Plaintiff's STD claim form. (AR at 232.) The DRE representative that completed Plaintiff's claim form circled "Heavy" to describe Plaintiff's job which corresponded with "100 lbs. Maximum lifting with frequent lift/carry up to 50 lbs." (*Id.* at 232.)

### 2. Dr. Weekes' Recommendation

This court agrees with the administrator's determination that Plaintiff has suffered from "chronic knee pain, congestive heart failure and lympadema for quite some time." (AR at 56.) This court further agrees that Plaintiff "continued to work with these conditions through January 31, 2012." (*Id.*) As to left knee pain, the *sole* basis of Plaintiff's STD claim, medical records do not support a "significant change" in Plaintiff's "physical functional capacity" to perform the "Material Duties" of his "Regular Job."

X-rays of Plaintiff's knee taken on February 2, 2012 suggested "*No signs* of joint effusion" and "*minimal* degenerative changes." (*Id.* at 140 (emphases added).) Similarly, medical records from March 1, 2012, noted that while Plaintiff suffers from

11

"generalized osteoarthritis," an examination revealed "Normal range of motion, Normal strength, No deformity, [and] Normal gait." (*Id.* at 83.)  Defendant had preliminarily approved Plaintiff's STD claim pending an orthopedic consultation scheduled for March 20, 2012.  Records from that consultation state that Plaintiff did suffer from joint line tenderness and effusion, but that he did not have crepitus and he did not experience pain with rotation of his knee. (*Id.* at 153, 155.)  Plaintiff received a cortisone injection and a prescription for etodolac to reduce swelling. (*Id.* at 188-191.)  Dr. Kowalski directed Plaintiff to return in three months but did not suggest that Plaintiff was unable to perform his job. (*Id.* at 188-191.)  Certainly, it is logical to assume that if Dr. Kowalski had concerns about Plaintiff's ability to perform his job, he would have informed Dr. Weekes, the doctor who made the initial referral.  Dr. Weekes' letter dated April 11, 2012 stating that Plaintiff "is having problems standing for long periods or walking long distances" and "needs to be off work indefinitely to allow further time for evaluation and treatment of his medical condition," is, therefore, not supported by the medical evidence.[3] (*Id.* at 123.)

Medical evidence dated after Dr. Weekes' April 11, 2012 letter further undermines Dr. Weekes' recommendations.  Physical therapist Hauser outlined specific restrictions for Plaintiff on April 27, 2011: Plaintiff can sit, stand, or walk for four hours at a time within a twelve hour period and Plaintiff should refrain from using his right arm to

---

[3] Dr. Weekes' notation from that same day, April 11, 2012, that an examination revealed, "*mila* edema" further undermines the credibility of his letter. (*Id.* at 120.) Similarly, Dr. Weekes' assessment on April 11, 2012, that Plaintiff had "limited range of motion" and "left knee gait," (*id.* at 120), flatly contradicts Dr. Trece's March 1, 2011, assessment of "Normal range of motion . . . [and] Normal gait," (*id.* at 83).

life anything over 50 pounds. (*Id.* at 192-3). In attempt to discredit Hauser's opinion, Plaintiff emphasized several times in his brief that Defendant erred in using "non-physician opinions."[4] (Pl.'s Mot. For J. at Pg 11.) This argument is without merit. According to the Policy,

> Physician means any of the following licensed practitioners:
> (a) a doctor of medicine (MD), osteopathy (DO), podiatry (DPM) or chiropractic (DC);
> (b) a licensed doctoral clinical psychologist; or
> (c) where required by law, *any other licensed practitioner* who is acting within the scope of his/her license.

(AR at 41 (emphasis added).) In order to practice, "physical therapists generally need a doctoral degree in physical therapy." *Physical Therapists*, MedlinePlus, http://stats.bls.gov/ ooh/ Healthcare/ Physical-therapists.htm (last visited August 20, 2013). Additionally, "All states require physical therapists to be licensed." *Id.*

Moreover, while plan administrators may not arbitrarily reject or refuse to consider the opinions of a treating physician, they "are not obligated to accord special deference to the opinions of treating physicians." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293-94 (6th Cir. 2005) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)). Thus, the "treating physician rule" applicable in Social Security disability benefit claims, *See* 20 CFR §§ 404.1527(d)(2), 416.927(d)(2) (2002), does not apply in the context of ERISA. *Black & Decker*, 538 U.S. at 825. In addition, ERISA does not "impose a heightened burden of explanation on administrators when they reject a

---

[4] Curiously, while Plaintiff argues several times that a physical therapist is not a doctor, Plaintiff repeatedly refers to nurse practitioner Kowalski as "*Dr*. Kowalski." (*See, e.g.*, Pl.'s Mot. For J. ¶ 20.)

13

treating physician's opinion." *Id.* at 831. The arbitrary and capricious standard is more deferential than the *de novo* standard employed in this case. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001). Just as a plan administrator owes no special deference to a treating physician, neither does this court in resolving the present claim.[5]

Finally, the court's determination is in accord with Plaintiff's own view of the medical evidence. Plaintiff has conceded that at the time of his STD request, "there was no change in his [sic] Mr. Little's conditions based on available medical records. . . ."[6] (Pl.'s Mot. For J. at Pg 12.) Therefore, no medical evidence supports a finding of "a

---

[5] "File reviews generally are an acceptable means for plan administrators to judge the merits of a claim for benefits." *Gray*, 2012 WL 2995469, at *6 (citing *Calvert*, 409 F.3d at 296). Still, Plaintiff might have, but did not, argue that Defendant's reliance on a nurse's review of records was inadequate, especially where, as is the case here, the Plan reserves the right to conduct an independent physical examination of the claimant. *See Calvert*, 409 F.3d at 295; *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir.2006). Nonetheless, perhaps cautiously, Defendant cites, but does not explain, *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013), in its reply brief. (Def.'s Mot. For J. at Pg 8). In *Judge*, the Sixth Circuit held, under an arbitrary and capricious standard, that a file-only review was adequate because the "file reviewers made no credibility determinations about Judge and did not second-guess Judge's treating physicians." The court explained further that the file reviewers' "findings simply echo those of Judge's own doctors, make note where the reports lack objective medical evidence in support of the boxes checked, and point out the internal inconsistencies." *Id.* Thus, even if Plaintiff had argued that Defendant's file-only review was inadequate, this argument would likely fail.

[6] In an attempt to blunt this concession, Plaintiff argues that, "what did change was [plaintiff's] ability . . . to perform his material job duties." (Pl.'s Mot. For J. at Pg 12.) Relying on *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 448 (6th Cir. 2009) and *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 862 (6th Cir. 2007), Plaintiff contends further that, "United failed to consider that Mr. Little had attempted to maintain full-time employment until he realized that he was no longer physically able to perform his material job duties . . . ." (Pl.'s Mot. For J. at Pg 12.) However, as Defendant points out, in both *DeLisle* and *Rochow*, the claimant primarily suffered from a medical

significant change" in Plaintiff's "physical functional capacity" to perform the "Material Duties" of his "Regular Job" in accordance with the Policy.

### 3. Defendant Would Prevail Irrespective of Dr. Weekes' Recommendations

Even if the court were convinced by Dr. Weekes April 11, 2012 letter, Defendant would still prevail. As noted earlier, the Policy defines "sickness" as "a disease, disorder or condition . . . for which you are under the care of a Physician. . . . [D]isability *must begin* while you are insured under the Policy." (AR at 41 (emphasis added).) Records from the orthopedic consultation on March 20, 2012, state that Plaintiff had been experiencing left knee pain *for five years*, that he *denied any recent trauma*, and that he had had cortisone injections *in the past* with noted relief. (*Id.* at 152-5 (emphases added).) Plaintiff's knee problems do not meet the definition of a disability entitling a claimant to STD benefits under the Policy because his knee problems began before October 1, 2011.

Finally, as Defendant has noted, Plaintiff's doctors have never made a connection between Plaintiff's various medical conditions and his knee pain.[7] However, even if Plaintiff or his doctors had made such a connection, Plaintiff's claim would still be denied. Effective February 3, 2011, the VA amended Plaintiff's evaluation

---

condition involving cognitive conditions (*i.e.,* memory loss) which caused the claimant to be fired for poor performance, but which was not diagnosed until after the claimant was fired.

[7] According to Defendant's call log regarding Plaintiff's disability claim, *Plaintiff* advised that he "has been told [by Doctor] congestive heart failure and lymphedema cause flux in knee pain and swelling . . . ." (AR at 45.) There is nothing in the administrative record to this effect from a physician.

15

description from "hypertensive heart disease with left ventricular hypertrophy evaluated as 30 percent disabling" to "hypertensive heart disease with chronic congestive heart failure . . . increased to 100 percent disabling." (*Id. at 188.*) Also on February 3, 2011, the VA determined that Mr. Little's hypertension (high blood pressure) with a 20 percent disability rating would be maintained. (*Id.* at 188-91.) Just like Plaintiff's left knee problems, Plaintiff's hypertensive heart disease and hypertension began before the Policy became effective on October 1, 2011. Therefore, he is not disabled under the Policy.

For the foregoing reasons, Plaintiff's request for STD benefits will be denied.

### B. Plaintiff's Claim for LTD Benefits

In response to Plaintiff's claim for LTD benefits, Defendant argues:

> [T]he long-term disability policy, unlike the short-term disability policy, contains a pre-existing condition provision under which a claim by plaintiff for long-term disability benefits would be barred if plaintiff—among other things—had drugs or medicines prescribed or taken for chronic knee pain in the three months prior to the day he became insured under the Policy; based upon records received from plaintiff during administrative review of his short-term disability claim, that appears to have been the case; in the event plaintiff were ever to apply for long-term disability benefits, United would seek medical records of plaintiff additional to those sought in connection with his short-term disability claim.

(Answer at ¶ 18.) However, as noted previously in the standard section, in reviewing a denial of benefits under ERISA, the court is limited to the administrative record. *Perry,* 900 F.2d at 966. The administrative record does not contain the alleged LTD plan that Plaintiff and Defendant argue about.

Accordingly, the request for LTD benefits must be denied.

### C. Plaintiff's Claim for Ongoing Life Insurance Coverage

In addition to STD and LTD benefits, Plaintiff requests ongoing life insurance coverage pursuant to a waiver of premium. (Compl. at ¶ 6.) Plaintiff cites no authority to support this claim and the court has been directed to nothing in the administrative record that pertains. It appears that all cases discussing waiver of premiums on life insurance policies cite specific provisions regarding premium waivers in the policy at issue. *See, e.g., Dozier v. Sun Life Assur. Co. of Canada*, 466 F.3d 532 (6th Cir. 2006).

Accordingly, Plaintiff's claim for ongoing life insurance pursuant to a waiver of premium will be denied.

### D. Plaintiff's Other Requests for Relief

In addition to requests for STD and LTD benefits as well as life insurance coverage, Plaintiff's complaint asks "that this court order United to re-open the administrative record so [Plaintiff] may submit updated medical evidence." (Compl. at Pg 5.) It is unclear if Plaintiff is requesting that *this court* consider additional evidence outside of the record or if the case should be remanded to further develop the record. Either way Plaintiff's argument fails.

"A district court may admit additional evidence in an ERISA benefit-denial case . . . if the plaintiff shows good cause for the district court to do so." *Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998). The "good cause" threshold has not been met because Plaintiff has offered no explanation of what evidence is missing or why it may be missing. Plaintiff states, "Had Mr. Little secured counsel before submitting his appeal . . . , his appeal would have been handled

correctly, thereby protecting the Administrative record in the event that litigation became necessary." (Pl's Resp. To Def.'s Mot. For J. at Pg 3.) Yet Plaintiff filed a statement asserting no procedural challenge. (Dkt. #7.) Furthermore, Plaintiff conceded in the same paragraph that he was left "to argue the minimal, yet extremely credible, evidence that made it into the AR." (Pl's Resp. To Def.'s Mot. For J. at Pg 3.)

Remanding the case would also be inappropriate because the record is sufficiently clear. There are no "exceptional circumstances" that warrant remand. *See Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027 (4th Cir. 1993) ("Exceptional circumstances . . . may warrant an exercise of the court's discretion to allow additional evidence. . . . [W]e do not intimate, however, that the introduction of new evidence is required . . . . [A] district court may well conclude that the case can be properly resolved on the administrative record without the need to put the parties to additional delay and expense."). Consequently, "[e]ffective judicial administration requires that we dispose of the matter here." *Levin v. Mississippi River Fuel Corp.*, 386 U.S. 162, 169-70 (1967).

Finally, Plaintiff's most recent court filing "asks this Court to . . . order United to allow Mr. Little to submit a LTD application for review and consideration." This argument fails because Plaintiff cites no authority that the court has such power.[8]

---

[8] This court takes no position as to whether or not Plaintiff may file an LTD claim. Plaintiff's ability to now file an LTD claim is likely dependant upon the terms of the LTD policy.

## IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Plaintiff's motion for judgment [Dkt # 15] is DENIED and Defendant's motion for judgment [Dkt. # 17] is GRANTED.

     s/Robert H. Cleland                  
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  August 30, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 30, 2013, by electronic and/or ordinary mail.

     s/Holly Monda for Lisa Wagner      
Case Manager and Deputy Clerk
(313) 234-5522